FILED
2012 Oct-10  AM 08:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BARRY BRACKIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No.  CV-10-03444-CLS** |
| | ) | |
| **INTERNATIONAL PAPER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## TABLE OF CONTENTS

I.      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **4**

II.     SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **5**

    A.     Defendant's Union Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **5**

    B.     Plaintiff's Employment History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **6**

    C.     David Mulligan's Arrival. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **7**

    D.     EDGE Training Schedule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **7**

    E.     February 16, 2009 E-Mail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **8**

    F.     Remote Training Approval. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **10**

    G.     Job Description Change. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **10**

    H.     Discussions With Melvin Sutton and Marvin Batts. . . . . . . . . . . . . . . . . . . .  **11**

    I.     March 2, 2009 "Restrictions Review" Meeting. . . . . . . . . . . . . . . . . . . . . . . .  **13**

    J.     Plaintiff's March 3, 2009 "First Step" Grievance. . . . . . . . . . . . . . . . . . . . .  **17**

    K.     March 17, 2009 "Termination" Meeting. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **18**

1

L.      May 1, 2009 EEOC Charge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

M.      Defendant's Response to Plaintiff's Grievance. . . . . . . . . . . . . . . . . . . . . . .   20

N.      Plaintiff's May 16, 2009 "Second Step" Grievance. . . . . . . . . . . . . . . . . . . .   21

O.      June 18, 2009 "Second Step" Grievance Meeting. . . . . . . . . . . . . . . . . . . . .   21

P.      Period of Unemployment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

Q.      August 10, 2009 "Return to Work" Meeting. . . . . . . . . . . . . . . . . . . . . . . . .   23

R.      August 13, 2009 "Return to Work" Memo. . . . . . . . . . . . . . . . . . . . . . . . . .   23

S.      August 17, 2009 Return to Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

T.      July 14, 2011 EEOC Charge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

III.     MOTION TO STRIKE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

A.      Plaintiff's Estimate of Lost Overtime. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

B.      Rumor About David Mulligan's Motives. . . . . . . . . . . . . . . . . . . . . . . . . . .   34

C.      Samantha Gilland's Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

IV.     MOTION FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

A.      The Americans with Disabilities Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

B.      Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

1.      *Prima facie* case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

a.      Does plaintiff have a "disability" within the meaning
        of the ADA?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

b.      Was plaintiff a "qualified individual with a disability"?. . . . . . . . .   43

c.      Did plaintiff suffer an adverse employment action?. . . . . . . . . . . .   48

d.      Did defendant inflict an adverse employment action
        upon plaintiff "because of" his disability?. . . . . . . . . . . . . . . . . . .   55

2

**2.**      **Pretext.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **58**

     **a.**      **Direct evidence of pretext.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

     **b.**      **Circumstantial evidence of pretext.** . . . . . . . . . . . . . . . . . . . . . . . **61**

**C.**      **Harassment.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **68**

**D.**      **Retaliation.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **69**

**E.**      **Failure to Accommodate.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **70**

**IV.**      **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **71**

## MEMORANDUM OPINION

Plaintiff, Barry Brackin, alleges that defendant, International Paper, engaged in disability-based employment discrimination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. ("ADA").[1]  The case currently is before the court on defendant's motions for summary judgment,[2] and to strike portions of the declaration submitted by plaintiff in opposition to summary judgment.[3]  Upon consideration of the parties' briefs and evidentiary submissions, this court will grant

---

[1] Doc. no. 1 (Complaint Filed December 13, 2010) ¶ 1.  Specifically, plaintiff states a claim for several different types of discrimination, including disparate treatment (Count I), unlawful termination (Count II), and retaliation and failure to accommodate (Count III).  *Id.* ¶ 14, 17, 20. Although defendant argues that plaintiff "incorrectly characterizes this employment decision as a 'termination,' rather than a lay-off," defendant also admits that "the label placed on the decision does not impact the legal analysis."  Doc. no. 55-1 (Brief in Support of Defendant's Motion for Summary Judgment), at 2.  Accordingly, this court will refer to the decision at issue as a "termination," and will not reach the issue of whether that decision is mislabeled.

[2] Doc. no. 55 (Defendant's Motion for Summary Judgment).

[3] Doc. no. 62 (Defendant's Motion to Strike Portions of Plaintiff's Declaration).

in part and deny in part each of the motions.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
>     The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted, alteration suppled).

## II. SUMMARY OF FACTS

### A.   Defendant's Union Agreement

Defendant is a producer of paper, packaging, and forest products that operates a facility known as the Courtland Mill in Courtland, Alabama.[4]  The hourly workforce at the mill is represented by the United Steelworkers International Union ("Union") in accordance with a collective bargaining agreement that covers the terms and conditions of employment, including, but not limited to, wages, seniority, and filling of vacant positions.[5]  Under that agreement, an employee who is off work due to an on-the-job injury continues to accumulate seniority for up to six years, and may eventually return to his former position or to a promotion, on the condition that he is capable of performing the essential functions of the job.[6]  In addition to any regular positions, defendant and the Union have agreed to permit limited temporary job assignments for hourly employees outside the line of progression.[7]  The collective bargaining agreement also provides a dispute resolution mechanism that allows represented employees to challenge management actions, including allegations of

---

[4] Doc. no. 56 (defendant's evidentiary submission), exhibit 10 (Declaration of David Mulligan) ¶¶ 4-5.

[5] *Id.* ¶¶ 7-8.

[6] Pl. Ex. 32.

[7] Doc. no. 57 (plaintiff's evidentiary submission), exhibit 5 (Deposition of Willie Fuller), at 22-24.

discrimination, by filing a grievance.[8]

## B.   Plaintiff's Employment History

Plaintiff began working at the Courtland Mill in 1979.[9]  Throughout his more than thirty years of service,[10] plaintiff was undisputedly an "excellent" employee.[11] After suffering two herniated discs in an on-the-job accident on June 19, 2003, however, plaintiff was forced to submit to back surgery in August of that year.[12]  He was released to return to work with light duty restrictions on October 28, 2003,[13] and issued permanent sedentary work restrictions more than two-and-a-half years later, in June of 2006.[14]  Defendant assigned him to positions that accommodated those restrictions.[15]

Under the terms of an agreement between defendant and the Union, defendant created the temporary position of Production, Services, and Distribution ("PS&D")

---

[8] Mulligan Decl. ¶ 9.

[9] Doc. no. 57 (plaintiff's evidentiary submission), exhibit 13-14 (Deposition of Barry Brackin), at 31.  Specifically, plaintiff was hired by Champion International Corporation, which was acquired by defendant in 2000.  Mulligan Decl. ¶ 3.

[10] Pl. Tr., at 31, 44.

[11] Doc. no. 57 (plaintiff's evidentiary submission), exhibit 3 (Deposition of Marvin Batts), at 8.

[12] Pl. Tr., at 48, 52; doc. no. 57 (plaintiff's evidentiary submission), exhibit 4 (Deposition of Waynette Boyd), at 7; Pl. Ex. 5; Pl. Ex. 8.

[13] Pl. Tr., at 48, 52; Boyd Tr., at 7; Pl. Ex. 6.

[14] Boyd Tr., at 76-77; Pl. Ex. 8.

[15] Pl. Tr., at 56, 68; Fuller Tr., at 33-34.

Training Coordinator as an accommodation for plaintiff on February 8, 2007.[16]  While it was understood that plaintiff was responsible for assisting defendant with employee training, ensuring that employees were complying with training requirements, and maintaining training documentation,[17] a formal, written job description for the PS&D Training Coordinator position did not exist.[18]

## C.   David Mulligan's Arrival

David Mulligan became the PS&D Manager for the Courtland Mill in October of 2008.[19]  Plaintiff alleged that he overheard Mulligan tell a coworker that he was there to clean up all the "low hanging fruit."  Plaintiff interpreted that statement as meaning that Mulligan "was going to try to find ways to eliminate employees with work restrictions."[20]  Mulligan, however, testified that the comment was a reference to the fact that he had much work to do, and that the statement "[was not] about trying to find things to do, [but about having] to prioritize [his] time."[21]

## D.   EDGE Training Schedule

---

[16] Pl. Tr., at 61; Fuller Tr., at 25-27; Pl. Tr. Ex. 5; Pl. Tr. Ex. 6.

[17] Doc. no. 57 (plaintiff's evidentiary submission), exhibit 2 (Deposition of David Mulligan), at 8, 31.

[18] *Id.* at 18, 19.

[19] *Id.* at 8.

[20] Pl. Decl. ¶ 8.

[21] Mulligan Tr., at 99 (alterations supplied).

In approximately 2006, defendant began to convert its facilities to the EDGE software program, a multi-million-dollar supply-chain initiative designed to integrate all of defendant's facilities into one operating model.[22]  Because the Courtland Mill was scheduled to start the EDGE program in August of 2009,[23] David Mulligan claimed that he identified EDGE training as a "significant need" of the PS&D Department for 2009.[24]  As a result, Courtland Mill employees were to be trained on EDGE to ensure their proficiency before the implementation of the program.[25] Employees responsible for training crew members and being a resource on EDGE were identified as "power users," and scheduled to attend a specialized "EDGE Power User" training at defendant's corporate headquarters in Memphis in late spring or early summer of 2009.[26]  Because plaintiff was the PS&D Training Coordinator, he was among the members of the PS&D Department chosen to attend the training.[27]  Thus, plaintiff made reservations and prepared to travel to Memphis.[28]

**E.    February 16, 2009 E-Mail**

---

[22] Mulligan Tr., at 20-22.  Although "EDGE" is spelled in capital letters throughout the record, it does not appear to be an acronym.

[23] *Id.* at 23.

[24] *Id.* at 18, 21, 34.

[25] *Id.* at 22-23.

[26] *Id.* at 18-21, 23-24, 26-27;  Pl.'s Tr., at 97, 98.

[27] *Id.*

[28]  Mulligan Tr., at 18-21, 23-24, 26-27.

As a consequence of his back injury, plaintiff occasionally experienced flare-ups of chronic pain.[29]  After one such flare-up in January of 2009, plaintiff's treating physician believed that he might need further treatment, including surgery.[30]  Because those treatments were to be scheduled through defendant's medical provider and approved through its worker's compensation process, defendant had knowledge of plaintiff's medical condition.[31]  Even so, plaintiff sent the following electronic mail (e-mail) message to David Mulligan on February 16, 2009:

> I just wanted to give you the courtesy of letting you know that my back problems have escalated[,] and I'm now going to physical therapy three times a week after work.  If this doesn't give me any relief, and so far it's only made the pain worse, then I'm probably facing another round of spinal injections.  I'm scheduled for another visit with my doctor on March 10[,] but I'm trying to get it move[d] to a sooner date.  If the injections don't help (I've had at least 8 of these in the past 2 years)[,] then the only other alternative is another back surgery[,] which will be a lumbar fusion.  That is definitely the last resort.
>
> I said all of this to say that I won't be able to attend the Memphis Edge classes due to the uncertainty of my medical condition at that time[,] and [of] which treatments I'll be going through then.  I wanted to go[,] and I put this decision off as long as I could [,] hoping that things would improve[,] but they haven't.
>
> I do graciously ask that when you pray[,] you will remember me and my medical issues.[32]

---

[29] Pl. Ex. 9; Pl. Ex. 23.

[30] Pl. Ex. 9; Pl. Ex. 10.

[31] Pl. Tr., at 132.

[32] Pl. Ex. 23 (alterations supplied).

Mulligan interpreted the e-mail as meaning that plaintiff could not attend the EDGE training sessions.[33]  However, he never spoke to plaintiff directly about the contents of the e-mail, and he did not know whether any other person in defendant's management structure had done so.[34]

## F.    Remote Training Approval

Plaintiff testified that, within the same week that he sent the e-mail to David Mulligan, he placed a call to defendant's EDGE trainers and obtained their approval to receive the training remotely, from his Courtland Mill computer.[35]  Because plaintiff was unable to name the EDGE trainers who allegedly approved his request for remote training, and because he did not inform Mulligan of the alleged approval,[36] that assertion is disputed.[37]

## G.    Job Description Change

Sometime after assuming his role as PS&D Manager, David Mulligan reviewed and refined the responsibilities of three temporary job assignments, including plaintiff's assignment as PS&D Training Coordinator.[38]  At the time, Mulligan knew

---

[33] Mulligan Tr., at 66.

[34] *Id.* at 35.

[35] Pl. Decl. ¶ 12.

[36] Fuller Tr. 194-196; Mulligan Tr. 59, 94-95, 100, 102-03.

[37] Doc. no. 74 (Defendant's Amended Reply Brief in Support of its Motion for Summary Judgment), at 2.

[38] Mulligan Tr., at 28.

that plaintiff had sedentary work restrictions and ongoing medical appointments.[39]

According to defendant, Mulligan reviewed plaintiff's assignment "shortly" after becoming PS&D Manager.[40]   According to plaintiff, Mulligan only refined plaintiff's assignment after he received plaintiff's February 16, 2009 e-mail.[41]  Upon reviewing the record pages cited by the parties, this court was unable to find support for either argument.[42]

The memorandum that described plaintiff's new assignment contained a bulleted section entitled "Immediate need for position," which included the following: "Be primary trainer for crews on EDGE transition.  Must attend training in Memphis and participate in monthly EDGE meetings."[43]

## H.   Discussions With Melvin Sutton and Marvin Batts

After receiving plaintiff's February 16, 2009 e-mail, David Mulligan had conversations with the Union area vice-president, Melvin Sutton, and the shipping and

---

[39] *Id.* at 32.

[40] Doc no. 55-1, at 5 (citing Mulligan Tr., at 28).

[41] Doc. no. 68 (Plaintiff's First Amended Response in Opposition to Defendant's Motion for Summary Judgment), at 3 (citing Mulligan Tr., at 35, 40).

[42] Indeed, when asked when he prepared the document that contained plaintiff's revised job description, Mulligan stated that he did not know.  Mulligan Tr., at 71.

[43] Pl. Ex. 41.  Even though plaintiff's original job title was "PS&D Training Coordinator," and even though plaintiff's revised job description had the heading of "Shipping and Warehouse/Roll Finishing Trainer," the parties have continued to refer to plaintiff as PS&D Training Coordinator, and have not questioned whether PS&D Training Coordinator and Shipping and Warehouse/Roll Finishing Trainer were, in fact, the same position.

warehousing area manager, Marvin Batts, during which Mulligan expressed a need to schedule a meeting about plaintiff.[44]  According to him, the three men discussed his concerns regarding plaintiff:  *i.e.*, "the two needs" (see the discussion in the following paragraph); and the fact that, "with this e-mail concern, we'd have a training coordinator that would not be able to fully be a training coordinator in the largest issue that we had that year."[45]  Mulligan did not take notes or remember any specific comments from his conversations with Sutton and Batts.[46]

Based on the context of Mulligan's deposition testimony, it appears that his reference to one of the two "needs" was intended to mean the need for plaintiff to provide hands-on fork and clamp truck training, which the parties referred to as "PIT training."[47]  However, Mulligan's reference to a second "need" could have been intended to mean *either* the need for plaintiff to *provide* EDGE training to employees, *or* the need for plaintiff to *attend* the EDGE training sessions in Memphis.[48]  It is unclear from the deposition testimony whether Mulligan mentioned to either Melvin

---

[44] Mulligan Tr., at 35-36.

[45] *Id.* at 35-36.

[46] *Id.* at 37.

[47] *See id.* at 32, 44 (stating that "the two main needs were around EDGE training and PIT training").

[48] *See id.* at 35, 44.

Sutton or Marvin Batts that he had revised plaintiff's job description, or that, as a result of the revision, plaintiff was at risk of being terminated.[49]

## I.    March 2, 2009 "Restrictions Review" Meeting

After his discussions with Sutton and Batts, Mulligan decided to schedule the meeting about plaintiff for March 2, 2009.[50]  On the day of the meeting, plaintiff, Mulligan, Sutton, and Batts were all in attendance.[51]  Again, Mulligan was not aware that any person present made minutes or kept records of the words spoken during the meeting.[52]

Before the meeting, Mulligan "did not have any direct conversation" with plaintiff, but he did tell Marvin Batts, the shipping and warehousing area manager, that "we were going to review these duties."[53]  Presumably, Mulligan was referring to plaintiff's job duties.

Mulligan did not specifically recollect what he told plaintiff during the meeting, but remembered "something to [the] effect" of letting him know that his job

---

[49] *See id.* at 35-36.

[50]  Mulligan Tr., at 36-37.

[51] *Id.*

[52] *Id.* at 37.

[53] *Id.* at 38 (alteration supplied).

13

description had been rewritten,[54] and that "the two main needs were around EDGE training and PIT training."[55]

At some point during the meeting, Mulligan handed Melvin Sutton, the Union area vice-president, the only copy of the revised job description for the position of PS&D Training Coordinator.[56]  He did so while Sutton and plaintiff "were sitting right next to each other."[57]  Even so, Mulligan could not confirm that plaintiff received a copy of the document.[58]   Plaintiff contends that he did not receive a copy until defendant responded to his discovery request in this litigation.[59]

It appears from the following lines of deposition testimony that Mulligan knew at the time of the March 2, 2009 meeting that plaintiff could receive at least part of his EDGE training on some date other than the one that was then scheduled to occur at defendant's Memphis headquarters:

A.    There's only a couple of times that you could do that training, that I was aware of.

Q.    Have you since found out that there are multiple times that you could take that training?

---

[54] *Id.* at 40 (alteration supplied).

[55] *Id.* at 44.

[56] Mulligan Tr., at 43; Pl. Ex. 41.

[57] *Id.*

[58] *Id.* at 55.

[59] Doc. no. 68, at 12; *see also* Pl. Decl. ¶ 24.

A.    The training itself could be done online.  The testing was — that
      was the only time you could do it.[60]

During the meeting, Mulligan did not specifically ask plaintiff about the status

of his medical condition, or the reason why he could not attend the EDGE training

program in Memphis.[61]   In fact, the only medical topic he remembered discussing was

the appointment mentioned in plaintiff's e-mail.[62]  When asked whether he specifically

stated that plaintiff's inability to attend the EDGE training sessions in Memphis was

a "problem," Mulligan's answers were inconclusive:

Q.    I mean, didn't you specifically tell him during the meeting, or did
      you, that the problem for him was his inability to attend EDGE
      training?  Or did you mention that at all?

MR. TURNER:  Object to the form.  Go ahead.

A.    No.[63]  There [were] two issues; there was the EDGE training[,]
      which[,] once again, came out of this[,] and then [there was] being
      able to do the PIT training, the fork truck training that was hands-
      on.  Once again, in dealing with the foreman, ideally the training
      coordinator would be the person who did that.[64]

. . . .

---

[60] Mulligan Tr., at 47.

[61] *Id.* at 45.

[62] *Id.*

[63] After receiving the objection to form, the attorney should clearly have rephrased the
question.  As a result of the convoluted sentence structure, this court is unable to determine what
Mulligan said "no" to.

[64] Mulligan Tr., at 39 (alterations supplied).

15

Q.    Did you tell [plaintiff], ["]Mr. Brackin, we desperately need you
       to go to the EDGE training?["]  Did you say those words?

A.    Like I said, I don't remember the specific words that I said.[65]

At some point during the meeting, Mulligan told plaintiff that defendant could

no longer accommodate his restrictions as PS&D Training Coordinator.[66]  While

plaintiff claims that Mulligan made the statement at the beginning of the March 2,

2009 meeting,[67] Mulligan did not "remember the specifics of when [he] said what."[68]

When plaintiff responded that he was scheduled for a follow-up medical appointment

on March 16, 2009, Mulligan made it clear that, if plaintiff's doctor modified his

restrictions, then "he could continue to be accommodated in that role," *i.e.*, as PS&D

Training Coordinator.[69]  Of course, the negative implication of such a statement was

that, if plaintiff's restrictions were not modified, then he would no longer be

"accommodated."

In any event, Mulligan and plaintiff later professed to have left the meeting with

extremely different impressions of what had transpired.  Mulligan later testified that

he believed

---

[65] *Id.* at 54-55 (alterations supplied).

[66] *Id.* at 52-53.

[67] Pl. Decl. ¶ 14.

[68] Mulligan Tr., at 48 (alteration supplied).

[69] *Id.* at 52-54.

> [t]he meeting was left with[,] ["H]ere's what is needed in this department for this training coordinator job.  We have an issue with this training.  I don't know how to get from here to you being able to facilitate training needs from an EDGE perspective.  You've got a doctor's appointment coming up[.]  I don't know what . . . that medical visit is for, but we'll wait until after you've talked to your doctor and come back and discuss.["][70]

On the other hand, plaintiff says that he was not informed of the fact that he was going to be terminated because he could not attend the EDGE training sessions in Memphis.[71]  Further, plaintiff contends that he was never told what his revised job duties were, or why he could not perform them with his disability.[72]  Finally, plaintiff asserts that Mulligan said that he would fill plaintiff's position with an "able bodied man."[73]

## J.    Plaintiff's March 3, 2009 "First Step" Grievance

The day after the March 2, 2009 meeting, plaintiff filed a "first step" verbal grievance pursuant to the Union's grievance procedure.[74]  Plaintiff challenged Mulligan's comments, and claimed that defendant had discriminated against him on the basis of his disability in violation of his rights under the ADA.[75]

---

[70] *Id.* at 56 (alterations supplied).

[71] Pl. Decl. ¶ 16; Pl. Tr., at 261-62.

[72] Pl. Decl. ¶ 15; Pl. Tr., at  263

[73] Pl. Decl. ¶ 14; Pl. Tr., at 266.

[74] Pl. Decl. ¶ 17; Pl. Tr., at 137.

[75] Pl. Tr., at 137.

**K.      March 17, 2009 "Termination" Meeting**

Following plaintiff's March 16, 2009 medical appointment and examination, his physician decided to leave plaintiff's medical restrictions unchanged.[76] The next day, plaintiff met with five representatives of defendant — David Mulligan; Marvin Batts, shipping and warehousing area manager; Willie Fuller, Personnel Manager; Samantha Gilland, Human Resource representative; and Waynette Boyd, plaintiff's medical case manager — and two representatives of the Union — Melvin Sutton and Timothy Prince — to review plaintiff's medical restrictions.[77]

At that meeting, Mulligan again stated that he had revised the original job description for PS&D Training Coordinator, and that defendant could no longer accommodate plaintiff in that position.[78] Additionally, in the declaration filed in opposition to summary judgment, plaintiff alleged that Samantha Gilland, the Human Resources representative

   was very hostile toward me . . . [and] seemed glad when she told me:

   a.      I would not receive any severance pay;

   b.      The statute had run on my workers' compensation case[,] and it
           could not be reopened;

---

[76] Pl. Decl. ¶ 18.

[77] *Id.*

[78] *Id.* ¶ 19; Mulligan Tr., at 93.

c.      I would not qualify for unemployment;

d.      I would have no insurance coverage;

e.      I would not qualify for disability retirement;

f.      I would not qualify for short- or long-term disability;

g.      That I could resign and get a job as a greeter at Wal-Mart if they
        would hire me for all they [defendant] cared;

h.      that "the monkey is on your back now."[79]

At his deposition, Mulligan "generally" remembered that Gilland had made the
"monkey" comment.[80]

Again, plaintiff believed that no one mentioned EDGE, and that he was not

allowed an opportunity to address whether he could perform the duties of PS&D

Training Coordinator as revised by Mulligan, with or without reasonable

accommodation.[81]   At the end of the meeting, he was told that he "no longer had a

job," and ordered to leave the mill premises.[82]

## L.      May 1, 2009 EEOC Charge

---

[79] Pl. Decl. ¶ 21 (alterations supplied).

[80] Mulligan Tr., at 92-93.

[81] Pl. Tr., at 263, 266-68.

[82] *Id.* at 268.

Plaintiff filed his initial charge of discrimination against defendant with the Equal Employment Opportunity Commission (EEOC) on April 10, 2009,[83] and amended that charge on May 1, 2009.[84]  In doing so, plaintiff marked the boxes for "disability" and "retaliation," and wrote a detailed factual statement that did not mention harassment.[85]

Although plaintiff alleged that he told defendant "of the computer training" in the EEOC charge,[86] this court was unable to find such a statement in the exhibit.[87] Indeed, if that statement had existed, it would have contradicted plaintiff's claim that he did not know that his inability to travel to Memphis to receive EDGE training had been a "problem."

## M.   Defendant's Response to Plaintiff's March 3, 2009 "First Step" Grievance

In the company's response to plaintiff's March 3, 2009 "first step" grievance, defendant argued that plaintiff had been terminated because he was unable to attend the EDGE training sessions in  Memphis.[88]  According to plaintiff, it was only upon receiving defendant's response to his grievance that he learned that his inability to

---

[83] Doc. 1; Pl. Tr. Ex. 14.

[84] Pl. Tr. Ex. 15.

[85] *Id.*

[86] Doc. no. 68, at 6.

[87] *See* Pl. Tr. Ex. 15.

[88] Pl. Ex. 27.  That response is not dated.  However, it contains a handwritten note stating, "Read to Mel Sutton 5/17/09 1:00 p.m."

travel to Memphis for training had been a "problem" and, by implication, that his online training approval had been relevant.[89]

**N.    Plaintiff's May 16, 2009 "Second Step" Grievance**

After receiving defendant's response to his "first step" grievance, plaintiff filed a "second step" grievance on May 16, 2009.[90]  Unlike his "first step" grievance, plaintiff's "second step" grievance stated that he had obtained the approval of defendant's EDGE trainers to receive the training from his Courtland Mill computer.[91]

**O.    June 18, 2009 "Second Step" Grievance Meeting**

In accordance with the Union's grievance procedure, Defendant held a meeting to discuss plaintiff's "second step" grievance on June 18, 2009.[92]  That meeting was attended by plaintiff; five representatives of defendant, including David Mulligan, Willie Fuller, and Samantha Gilland; and three representatives of the Union, including Melvin Sutton and Timothy Prince.[93]

Unbeknownst to defendant, plaintiff surreptitiously taped several grievance meetings using a hidden digital recorder.  Plaintiff did not reveal the existence of the recordings until his deposition on September 23, 2011, and defendant then had them

---

[89] Pl. Decl. ¶¶ 24-25.

[90] Pl. SoF 13, 18-19.

[91] Pl.  Ex. 26; Pl. Tr. Ex. 15.

[92] Pl. Ex. 28.

[93] *Id.*

transcribed.[94]   Further, defendant kept notes of the June 18, 2009 meeting, which reflected a conversation among plaintiff, Mulligan, Fuller, and Sutton.[95]   According to those notes, plaintiff argued that he did not receive a copy of his revised job description at the March 2, 2009 "restrictions review" meeting, that defendant's EDGE trainers had agreed that he could obtain the training on his computer, and that defendant could have rescheduled the training for some other date.[96]   Mulligan testified that plaintiff had never before mentioned receiving the EDGE trainers' approval,[97] and that, as a result, management investigated his claim that the training was available remotely.[98]   At the end of the meeting, plaintiff remained unemployed.[99]

## P.   Period of Unemployment

While plaintiff was unemployed, he received $3,825 in unemployment compensation,[100] but otherwise had neither wages nor insurance coverage.[101]   As a result, plaintiff had to spend much of his family's savings and sell personal property,

---

[94] Doc. no. 55-1, at 8 n.5.

[95] *See id.*

[96] Pl. Ex. 28.

[97] *Id.* at 100; Fuller Tr., at 145, 154-55, 195-96; Pl. Ex. 28.

[98] Fuller Tr., at 135-37.

[99] *Id.*

[100] *See* doc. 61-1.

[101] Pl. Decl. ¶ 31.

including an automobile, to make ends meet.[102]   He also began seeing a certified

counselor and taking medication for depression and anxiety.[103]

## Q.    August 10, 2009 "Return to Work" Meeting

Five months after the termination of plaintiff's employment, defendant invited

him to attend yet another meeting on August 10, 2009, that was attended by David

Mulligan, Willie Fuller, Marvin Batts, Melvin Sutton, and several other persons.[104]

During that meeting, Fuller stated:   "Now, [the question of,] ['S]hould we have

pursued whether or not someone has a medical restriction that we would have to

accommodate[?'] is a different situation.   And so, we should've pursued that.   We

didn't.   Okay, so our bad."[105]   Despite the fact that Fuller held the title of Personnel

Manager, he obviously was incoherent and not learned in English grammar.   Even so,

defendant offered to bring plaintiff back to work, *but only upon the condition that he*

*drop his EEOC charge and agree not to pursue legal action*.[106]

## R.    August 13, 2009 "Return to Work" Memo

Defendant sent plaintiff a memo entitled "Return to Work" on August 13, 2009.

The document stated that defendant had decided to return him to "work effective

---

[102] *Id.*

[103] Pl. Tr., at 225-32; Pl. Decl. ¶ 30.

[104] Pl. Decl. ¶ 26.

[105] Brackin Recording Tr., at 89 (alterations supplied).

[106] *Id.*

Monday, August 17, 2009[,] in the same job assignment and under the same conditions" as when he was terminated on March 17, 2009.[107]  As the memo did not mention that plaintiff was required to drop his EEOC charge or waive his legal claims, it appears that someone with at least a modest amount of walking-around sense had realized that such prerequisites for reinstatement amounted to extortion, and that defendant had sensibly abandoned those demands.[108]  In any event, by way of explanation, the "Return to Work" memo given to plaintiff stated that:

> On March 17, 2009, a meeting was held with you to discuss your permanent medical restrictions in light of the requirements of your job assignment as PS&D Training Coordinator.  At issue was whether or not your restrictions could continue to be accommodated in light of the requirements of the job assignments.  Specifically at issue was your attendance of EDGE training in Memphis, which you informed the Company you could not attend because of your medical restrictions.  The meeting concluded with the determination that your restrictions could no longer be accommodated in the PS&D Training Coordinator assignment. You now, however, have indicated that you are able to attend training in Memphis.[109]

The "Return to Work" memo also stated that plaintiff was to be "made whole for lost earnings," and that the revoked termination decision would not affect his seniority.[110]  Indeed, defendant paid plaintiff the gross amount of $23,170.99 (the net

---

[107] Pl. Ex. 30 (alteration supplied).

[108] *See* Pl. Decl. ¶ 28; Pl. Ex. 30.

[109] Pl. Ex. 30.

[110] *Id.*

amount of $9,901.97), which represented the entire amount of back pay for his time off of work.[111]   Defendant also made plaintiff whole for the 401(k) and Retiree Medical Savings Plan contributions that would have been made from March 17, 2009 through August 16, 2009,[112] and ensured that his seniority was not affected.[113] However, defendant did not compensate plaintiff for lost overtime opportunities, which plaintiff estimates amounted to an additional $12,000.[114]

## S.   August 17, 2009 Return to Work

Plaintiff returned to work on August 17, 2009.[115] However, he was not returned to his old duties, but was instead assigned to managing inventory.[116] He also was not returned to his old office, but was instead repeatedly moved around, from desk to desk.[117] Finally, he was not placed under the same supervisor, but was placed under the supervision of the inventory and warehouse manager, Anna O'Dell.[118]

According to plaintiff, defendant had assigned the office next to his to Timothy

---

[111] Pl. Tr., at 178-179; Pl. Tr. Ex. 11.  The net figure was computed by taking the gross figure and subtracting the following:  $7,467.71 in "taxes," $5,792.75 in "before tax," and $8.56 in "after tax."  See Pl. Tr. Ex. 11.

[112] Pl. Tr., at 162.

[113] Id. at 161.  Although plaintiff withdrew from the Union in February of 2010, his seniority remained intact.  Id. at 242-245.

[114] Pl. Decl. ¶ 32.

[115] Pl. Tr., at 156.

[116] Id. at 80, 184.

[117] Id.

[118] Id.; Mulligan Tr., at 140

25

Prince, a non-disabled man, in early 2009, and increasingly assigned Prince tasks that plaintiff previously had performed as PS&D Training Coordinator.[119]   Plaintiff believed that, after he was terminated, Prince assumed many of plaintiff's former duties, and received most of his old work equipment, including plaintiff's laptop computer and digital camera.[120]

David Mulligan admitted that plaintiff was not reassigned to his pre-termination position of PS&D Training Coordinator, and "was only assigned training in relation to the crew leaders and initial EDGE training."[121]   Even so, he asserted that neither Prince nor any other person was assigned to take plaintiff's place.[122]   In other words, Mulligan appeared to argue that the PS&D Training Coordinator position had been eliminated.[123]

Following plaintiff's reinstatement, defendant never rescheduled his EDGE training.[124]   According to Mulligan, plaintiff has learned how to use the EDGE system from his coworkers, and has not experienced any difficulty in using the EDGE system, or any limitation on his ability to perform computer-generated work, based on the fact

---

[119] Pl. Tr., at 189.

[120] *Id.* at 189, 192.

[121] Mulligan Tr., at 139.

[122] *Id.* at 88.

[123] *Id.*

[124] *Id.* at 128.

that plaintiff did not attend the training in Memphis.[125]

## T.    July 14, 2011 EEOC Charge

Plaintiff filed his second EEOC charge on July 14, 2011.[126]  In doing so, he marked the box for "retaliation," and alleged that defendant returned him to a position other than PS&D Training Coordinator in retaliation for his act of filing his original EEOC charge on May 1, 2009.[127]  Like his first EEOC charge, plaintiff's second EEOC charge did not mention harassment.[128]

## III.  MOTION TO STRIKE

Prior to analyzing defendant's summary judgment motion, it is necessary to address defendant's motion to strike portions of the declaration submitted by plaintiff in opposition to summary judgment.

## A.    Plaintiff's Estimate of Lost Overtime

In this Circuit, "a party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction."  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries,*

---

[125] *Id.* at 130.

[126] Pl. Tr. Ex. 16.

[127] *Id.*

[128] *Id.*

*Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  "When this occurs, the court may disregard the affidavit as a sham."  *Rollins*, 833 F.2d at 1530 (citing *Van T. Junkins*, 736 F.2d at 658-59).

Courts are admonished to "apply this rule sparingly," however, "because of the harsh effect [it] may have on a party's case."  *Rollins*, 833 F.2d at 1530.  Moreover, a mere discrepancy will not justify a district court's refusal to accept such evidence. *See Tippens v. Celotex Corporation*, 805 F.2d 949, 954 (11th Cir. 1986); *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

> To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness . . . was stating the truth.  Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.  Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.  An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."

*Tippens*, 805 F.2d at 953-54 (quoting *Van T. Junkins*, 736 F.2d at 657).  Thus, the court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit."  *Rollins*, 833 F.2d at 1530.

Here, defendant challenges plaintiff's declaration that "I believe that being laid off by IP [*i.e.,* the defendant, International Paper] caused me to miss overtime opportunities. I estimate I would have received $12,000.00 in overtime pay during that time."[129]  According to defendant, that estimate contradicts two prior statements:[130] *i.e.,* a deposition answer by plaintiff that indicated he was only able to work a "max" of eight hours a day;[131] and, a May 17, 2011 e-mail inquiring about a Crew Leader opening, and stating that "my restrictions remain the same as they've been. Lifetime sedentary, 8 hours a day, 40 hours a week, no O/T [overtime]."[132] Although both arguments will prove valuable when cross-examining plaintiff at trial, they do not have enough merit to justify striking plaintiff's claim altogether.

First, when plaintiff was asked to state an opinion about whether he could work more than eight hours a day, he did not give an entirely clear answer. Rather, his testimony was that his condition got better or worse from day to day, but the innuendo of his response was that his back injury limited him to an eight-hour day:  "It's just as I said before, [it's] solely day to day with me, with my condition. . . . [I]t's just day

---

[129] Pl. Decl. ¶ 32.

[130] Doc. no. 62, at 1-3.

[131] Pl. Tr., at 43 (alteration supplied).

[132] *Id.* at Def. Exh. 12 (alteration supplied).

to day.  Some days, it's worse.  Some days, it's better.  I think eight hours is . . . my max.  I really do."[133]

Further, when plaintiff sent the e-mail stating that his restrictions remained "[l]ifetime sedentary, 8 hours a day, 40 hours a week, no O/T [overtime],"[134] he did so in the context of an inquiry about a Crew Leader opening.  However, the positions of Crew Leader and PS&D Training Coordinator imposed different physical demands.  Specifically, the Crew Leader position entailed "continuous climbing, lifting, pulling, tugging, [and] walking,"[135] while the PS&D Training Coordinator position was created to accommodate plaintiff's restrictions,[136] and involved assisting defendant with employee training, ensuring that employees were complying with training, and maintaining the documentation on training.[137]  Thus, the fact that plaintiff was unable to work more than eight hours a day as a Crew Leader did not necessarily mean that he was unable to do so as a PS&D Training Coordinator.

More importantly, fully two-and-a-half years separated plaintiff's termination of employment on March 17, 2009, and defendant's deposition of him on September 22, 2011.  Plaintiff testified that, during his period of unemployment, he was "fully

---

[133] *Id.* at 43 (alterations supplied).

[134] *Id.* at Def. Exh. 12 (alterations supplied).

[135] *Id.* at 208 (alteration supplied).

[136] Fuller Tr., at 25-27; Pl. Tr. Ex. 5; Pl. Tr. Ex. 6.

[137] Mulligan Tr., at 8, 31.

capable" of doing "quite a bit of . . . desk [and] computer overtime" in order to assist with EDGE training and implementation.[138]   However, he also testified that "my condition, even as my doctors told me in the beginning, is progressively getting worse."[139]  Thus, it is certainly not inconsistent that plaintiff could perform "quite a bit of . . . desk [and] computer overtime" in 2009, but that he could not do more than eight hours a day of "continuous climbing, lifting, pulling, tugging, [and] walking" by 2011.

Additionally, defendant argues that plaintiff "has offered nothing more than speculation and conjecture that there were actually any available overtime opportunities that he missed and, if there truly were any, the specific amount of such lost overtime."[140]  In support, defendant cites *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), in which the Eleventh Circuit held:

> Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has "personal knowledge of the facts set forth in th[e] affidavit"), a statement that the affiant believes something is not in accordance with the Rule [56].

*Id.* at 1279 (alterations in original) (citing *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1376 (9th Cir. 1978)).

---

[138] Pl. Tr., at 153 (alterations supplied).

[139] *Id.* at 112.

[140] Doc. no. 62, at 5.

31

However, *Pace* is distinguishable because it involved a different type of factual statement.  In *Pace,* the affiant alleged that he "observed motion in the red car which *I believe* was [the decedent] raising his hands towards the roof of his car in an attempt to surrender."  *Id.* at 1278 (alteration and emphasis supplied).  By its nature, the question of whether someone raised his hands in the air can be answered with certainty.  In the present case, however, plaintiff alleged that, if he had not been terminated, he could have worked overtime and received an additional $12,000 in compensation.[141]  The issue of what plaintiff would have done if the circumstances had been different is inherently uncertain.

Finally, defendant argues that plaintiff's overtime estimate is "simply absurd," in light of his "history of relatively small amounts of overtime worked."[142]  In support, defendant cites *Cabrera v. LaHood*, No. 08-23152, 2011 WL 2600705 (S.D. Fla. June 29, 2011), in which the court rejected the plaintiff's argument in an adverse employment action for lost overtime opportunities because he merely speculated about those opportunities and did not offer evidence that overtime was available, or that he would have been eligible.  *Id.* at *6-7.  However, *Cabrera* is distinguishable because the plaintiff in this case testified that EDGE training and implementation "entailed

---

[141] Pl. Decl. ¶ 32.

[142] Doc. no. 62, at 6.

32

quite a bit of . . . desk [and] computer overtime," and that he was "fully capable" of working those hours.[143]

Indeed, plaintiff worked a total of 19.8 hours of overtime in the fifteen months before his termination, an average of less than two hours per month.[144]  However, it is unclear whether plaintiff worked relatively few hours of overtime because he was physically incapable of working overtime, or because he was mentally uninterested in working overtime, or because defendant offered few opportunities for working overtime that fit with plaintiff's restrictions.  If defendant had previously offered few opportunities for sedentary overtime, it is certainly not "absurd" that plaintiff would have seized the chance to work the desk and computer overtime associated with EDGE training and implementation.  Given that uncertainty, defendant's argument should be resolved by a trier of fact, not by a motion to strike; and the credibility of plaintiff's assertions tested by the greatest engine for the discovery of truth ever devised by the minds of men:  cross-examination.  When that is done, this court very seriously doubts that plaintiff will recover an amount anywhere near $12,000 in overtime compensation, if he recovers any amount at all.  But this court is not the judge of such facts.  The jury will be.

---

[143] Pl. Tr., at 153.

[144] Doc. no. 62 (defendant's evidentiary submission), Exhibit 1 (Declaration of Madison Brown), at Exhibit A.

**B.      Rumor About David Mulligan's Motives**

Federal Rule of Evidence 801(c) defines "hearsay" as meaning "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Here, defendant challenges plaintiff's declaration that "there was a rumor in the [PS&D] department that Mulligan was sent there to get rid of employees with restrictions,"[145] and asserts that "this statement is hearsay that is not the subject of any permissible exception."[146]   In response, plaintiff argues that he

> does not offer evidence of the rumor that Mulligan came to PS&D to get rid of people with restrictions to prove the truth of the statement.  Rather, [plaintiff] offers the statement to show the state of the environment at the Mill at the time [he] was laid off.[147]

In the context of the case, however, it is clear that plaintiff indeed offers that statement to prove the truth of the rumor.   For example, in his amended opposition to defendant's motion for summary judgment, plaintiff cites that statement as evidence of "discriminatory intent":

> In this case, there are numerous instances of the decision maker, David Mulligan, and others making statements to and around [plaintiff] evidencing a discriminatory intent.  In late 2008 and early 2009, a rumor

---

[145] Pl. Decl. ¶ 8 (alteration supplied).

[146] Doc. no. 62, at 7 (citing Fed. R. Evid. 801-803).

[147] Doc. no. 69, at 3 (alterations supplied).

34

was going around the PS&D Department that Mulligan was going to be getting rid of people with restrictions.  (Pl.'s Decl. p. 2.)[148]

Further, even assuming that plaintiff offers the statement to prove "the state of the environment at the Mill" at the time he was terminated, he does not assert a claim of hostile work environment,[149] or cite that statement in his statement of facts.[150]  Thus, it does not appear to be relevant to any of the claims or defenses in this case.

In *Pritchard v. Southern Co. Services*, 92 F.3d 1130 (11th Cir. 1996), the defendant discharged the plaintiff engineer after she was diagnosed with depression, and told that she could no longer work in the high-stress nuclear field.  *Id.* at 1132-33. To rebut the defendant's nondiscriminatory reason for terminating her employment, the plaintiff offered her deposition testimony about the following matters:

> 1) she had heard of a male employee named Loren Secrist who was transferred to a non-nuclear position; 2) she did not know for certain why he was transferred[,] but she thought it was related to the stress of nuclear work; 3) she thought he was an engineer, but she was not certain; 4) all of her information about Mr. Secrist came from conversations with co-workers; and 5) she could not recall the names of any of the co-workers who had provided this information.

*Id.* at 1135 (alteration supplied).  In response, the *Pritchard* court held that:

> It is true that inadmissible hearsay may sometimes be considered by a court when ruling on a summary judgment motion.  *See Church of*

---

[148] Doc. no. 68, at 26 (alteration supplied).

[149] *See* discussion in section IV(C), *infra*.

[150] *See* doc. no. 69.

> *Scientology Flag Service Org., Inc. v. City of Clearwater*, 2 F.3d 1514,
> 1530 (11th Cir.1993), *cert. denied*, [513] U.S. [807], 115 S. Ct. 54, 130
> L. Ed. 2d 13 (1994); *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d
> 1013, 1015 & n. 1 (11th Cir.1987). *However,* [the plaintiff] *cannot use*
> *inadmissable hearsay to defeat summary judgment when that hearsay*
> *will not be reducible to admissible form at trial.* See McMillian v.
> *Johnson*, 88 F.3d 1573 (11th Cir.1996). There is nothing to indicate that
> [the plaintiff's] statements (which were based on the statements of
> unknown co-workers) will lead to admissible evidence.

*Id.* at 1135 (alterations and emphasis supplied). Likewise, in *Turner v. City of Auburn*,

No. 07-162, 2008 WL 5328639 (M.D. Ala. December 18, 2008), *aff'd*, 361 F. App'x

62 (11th Cir. 2010), the court struck a statement that the affiant "heard rumors that the

promotion process at the fire station was 'fixed'" on the grounds that it was hearsay

not subject to an exception. *Id.* at *12.

As in *Pritchard* and *Turner*, the plaintiff in the present case has not offered a

vehicle by which the hearsay statement of rumors heard from unknown coworkers can

be reduced to admissible evidence at trial. Thus, this court will grant the motion to

strike the "rumor" reference from plaintiff's declaration, and will not consider that

reference in reviewing defendant's summary judgment motion.

## C.    Samantha Gilland's Statements

Finally, defendant challenges plaintiff's declaration that Samantha Gilland was

"very hostile," and made a number of hateful, biting comments during the March 17,

2009 "termination" meeting,[151] on the grounds that her statements and opinions are neither relevant nor material under Federal Rules of Evidence 401and 402, and that the probative value of those statements is substantially outweighed by the danger of "unfair prejudice" and "confusion of the issues" under Federal Rule of Evidence 403.[152]

Specifically, defendant argues that Gilland was merely a Human Resource generalist who neither made nor influenced Mulligan in making the decisions to stop accommodating plaintiff and, ultimately, to terminate his employment.[153] Additionally, defendant argues that, as the person who was responsible for workers' compensation issues, Gilland only attended the meeting to address plaintiff's eligibility for additional benefits through workers' compensation, and to answer his questions about benefits following his termination.[154]

In response, plaintiff argues that defendant understates Gilland's involvement.[155] Specifically, Willie Fuller, defendant's inarticulate, incoherent Personnel Manager, testified that Gilland and Mulligan informed him "that there was an issue [with

---

[151] Pl. Decl. ¶ 21.

[152] Doc. no. 62, at 8.

[153] Mulligan Decl. ¶¶ 3-4.

[154] *Id.* ¶ 5.

[155] Doc. no. 69, at 4.

plaintiff] and that they were working on that issue";[156] that Gilland, Mulligan, and Fuller discussed that issue for "some weeks" before the March 17, 2009 meeting;[157] that defendant's human resource personnel reviewed decisions to terminate an employee with restrictions;[158] and that Gilland, Mulligan, and Fuller did, in fact, review that decision with respect to plaintiff.[159]

In reply, defendant argues that Fuller's testimony actually supports its argument that Gilland did not make the decision to terminate plaintiff's employment, "as it makes sense that [she] would have been consulted about [workers' compensation] topics once Mulligan had made the decision that Plaintiff could no longer be accommodated."[160]   At best, however, defendant's argument shows that the evidence regarding Gilland's involvement is susceptible to two plausible inferences.  Thus, it should also be resolved by the trier of facts, not by a motion to strike.

Even though defendant cites *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997), for the proposition that "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case," *id.* at 1563-64 (citations omitted, alteration supplied), that case is

---

[156] Fuller Tr., at 15 (alteration supplied).

[157] *Id.* at 14, 18.

[158] *Id.* at 89.

[159] *Id.* at 90.

[160] Doc. no. 71, at 4 (alterations supplied).

distinguishable.  In *Holifield*, the plaintiff offered statements from "[s]everal staff members, none of whom worked directly with [him]," or, apparently, had any connection to the challenged action.  *Id.* at 1563 (alterations supplied).  Here, there is evidence linking Gilland to the March 17, 2009 decision to terminate plaintiff's employment.

Finally, defendant argues that Gilland's statements run afoul of Federal Rule of Evidence 403, because "[plaintiff] clearly intends to unfairly tar [defendant] and its decision-making with the alleged comments of someone not at all involved in the decision."[161]   As explained above, plaintiff has presented some evidence that is susceptible to the inference that Gilland influenced the March 17, 2009 decision to terminate his employment.  If a jury determines that to be the case, then her hateful and insensitive statements expressing hostility toward plaintiff in the context of medical restrictions imposed as a result of an on-the-job back injury will certainly be relevant, and that portion of the motion to strike should be denied.

## IV.  MOTION FOR SUMMARY JUDGMENT

### A.    The Americans with Disabilities Act

The Americans with Disabilities Act ("ADA"), was enacted by Congress in 1990 for the stated purpose of providing "a clear and comprehensive national mandate

---

[161] Doc. no. 62, at 8 (alteration supplied).

for the elimination of discrimination against individuals with disabilities." 42 U.S.C.

§ 12101(b)(1).[162]  To achieve that purpose, the ADA provides that no covered entity,[163]

including private employers,[164]

> shall discriminate against *a qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*Id.* § 12112(a) (emphasis supplied).

The phrase "qualified individual with a disability" means "an individual with

a disability who, with or without reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires."  *Id.* §

---

[162] When considering the need for such legislation, Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination . . . continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).  Discrimination was found to persist in "critical areas" of everyday life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services."  *Id.* § 12101(a)(3). Congress further found that discrimination against persons with disabilities took many forms, ranging from "outright intentional exclusion," to "failure to make modifications to existing facilities and practices."  *Id.* § 12101(a)(5).  Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled persons, and to integrate them "into the economic and social mainstream of American life."  S. Rep. No. 101-116, p. 20 (1989); H.R. Rep. No. 101-485, pt. 2, p. 50 (1990); U.S. Code Cong. & Admin. News 1990, pt. 2, pp. 303, 332.

[163] 42 U.S.C. § 12111(2) provides:  "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee."

[164] 42 U.S.C. § 12111(5)(A) provides, in relevant part, that:  "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . ."

12111(8).  In turn, the concept of "disability" is defined three ways:  that is, as including (*a*) any person who has a "physical or mental impairment" that "substantially limits" one or more of the person's "major life activities," or (*b*) a person who has "a record of such an impairment," or (*c*) a person who is "regarded as having such an impairment."  *Id.* §§ 12102(2)(A) – (C); *see also* 29 C.F.R. § 1630.2(g).  "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions."  *Gordon v. E.L. Hamm & Associates, Inc*., 100 F.3d 907, 911 (11th Cir. 1996).

The ADA imposes upon employers the duty to provide "reasonable accommodations" for known disabilities, unless doing so would result in an undue hardship to the employer.  42 U.S.C. § 12112(b)(5)(A).[165]  In addition, the ADA contains a provision, similar to that contained in Title VII of the Civil Rights Act of 1964, prohibiting retaliation against persons who exercise rights conferred by the

---

[165] 42 U.S.C. § 12112 defines the term "discriminate" as including an employer's failure to make

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant [for employment] or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . .

42 U.S.C. § 12112(b)(5)(A).

legislation, or who testify or otherwise participate in an investigation or other proceeding under the ADA.[166]  *See* 42 U.S.C. § 12203(a).[167]

In the absence of direct evidence of a discriminatory intent, a plaintiff can establish a *prima facie* case of discrimination under the ADA by showing:  (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he could perform the essential functions his job, with or without reasonable accommodation being made by the employer; and (3) that he suffered an adverse employment action (4) because of his disability.[168]  *See, e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001).[169]

---

[166] 42 U.S.C. § 2000e-3(a) provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subtitle, or because he has made a charge, testifies, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[167] 42 U.S.C. § 12203(a) provides that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this chapter.

[168] There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled."  *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (*per curiam*)).

[169] *See also, e.g., Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445,

**B.      Discrimination**

**1.      *Prima facie* case**

**a.      Does plaintiff have a "disability" within the meaning of the ADA?**

Defendant does not deny that plaintiff can satisfy the first element of a *prima facie* case.[170]   Thus, this court will assume that plaintiff has a "disability" within the meaning of the ADA.

**b.      Was plaintiff a "qualified individual with a disability"?**

In addition to establishing that he has a "disability," a plaintiff seeking to recover under the ADA also must demonstrate that he is a "qualified individual" within the meaning of the statute.   As previously noted, the term "a qualified individual with a disability" is defined as "an individual with a disability who, with

_____

1454 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)); *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir.) ("In order to establish a prima facie case under the Americans with Disabilities Act of 1990, . . . Pritchard must show that: 1) she has a disability, 2) she is a qualified individual, and 3) she was discriminated against because of the disability"), *amended on reh'g*, 102 F.3d 1118 (11th Cir. 1996).   Other courts of appeals have made similar findings. *See, e.g.*, *McKay v. Toyota Motor Manufacturing*, 110 F.3d 369 (6th Cir. 1997) ("A party seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability"); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 (4th Cir. 1996) ("To establish a cause of action under the ADA, a plaintiff must demonstrate: '(1) that she has a disability; (2) that she is otherwise qualified for the employment or benefit in question; and (3) that she was excluded from the employment or benefit due to discrimination solely on the basis of the disability'") (internal citations omitted).

[170] Doc. no. 55-1, at 10-11.

or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m);[171] *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("A qualified individual with a disability must satisfy 'the requisite skill, experience, education and other job-related requirements of the employment position,' and 'with or without reasonable accommodation,' the individual must be able to perform the 'essential functions of the position.'") (internal citations omitted).

The ADA defines "essential functions" as the fundamental job duties of the employment position, as differentiated from "marginal" functions. *LaChance*, 146 F.3d at 835 (citing 29 C.F.R.§ 1630.2(n)). Further, the ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111. Thus, "the employer's view is entitled to substantial weight in the calculus" of whether a function is essential.

---

[171] 29 C.F.R. § 1630.2(m) provides: "Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. (See § 1630.3 for exceptions to this definition)."

*D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1234 (11th Cir. 2005); *see also*

*Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007).

Even so, "allowing an employer free reign to decide what an 'essential function'

is would allow employers to subvert the congressional mandate of the ADA by

redefining at will disabled individuals as unqualified ones." *Calvo v. Walgreens*

*Corp.*, 340 F. App'x 618, 622 (11th Cir. 2009). Thus, "defendant-employers cannot

recast what the essential functions of a job are for ADA purposes." *Treadwell v.*

*Dow-United Techs.*, 970 F. Supp. 962 (M.D. Ala. 1997) (citing *Whillock v. Delta Air*

*Lines*, 926 F. Supp. 1555, 1563 (N.D. Ga. 1995)).

> Indeed, if [the judgment of the employer] were considered to be
> conclusive, then an employer that did not wish to be inconvenienced by
> making reasonable accommodation could, simply by asserting that the
> function is "essential," avoid the clear congressional mandate that
> employers "mak[e] reasonable accommodations to the known physical
> or mental limitations of an otherwise qualified individual with a
> disability."

*Holly*, 492 F.3d at 1258 (citing 42 U.S.C. § 12112(b)(5)(A)) (emphasis omitted,

alterations supplied).

After reviewing the evidence and making all reasonable inferences in plaintiff's

favor, *see Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*),

this court holds that EDGE training was "essential," while the requirement that

plaintiff travel to defendant's headquarters in Memphis to obtain such training was

not.   Because it is undisputed that the EDGE program was an entirely new, multi-million-dollar, supply-chain initiative — the purpose of which was to integrate all of defendant's facilities into one operating model[172] — plaintiff freely admits that "the EDGE software transition was no doubt of great importance to [defendant]."[173]  Thus, it was an essential function of plaintiff's position to be trained, and to thereafter train defendant's employees, on EDGE.[174]

On the other hand, it is disputed whether the requirement for plaintiff to travel to Memphis to receive his training was "essential."  On the one hand, defendant argues that "power users" such as plaintiff "were required to obtain intense special training in a laboratory setting at the corporate headquarters in Memphis using the EDGE system so that they could train employees[,] as well as be[come] subject matter experts and resources."[175]  On the other hand, plaintiff argues that the EDGE Power User Training Pamphlet "states that Power Users who could not come to EDGE training in Memphis would instead take an 'On-Site Power User Education Session' to fulfill the initial EDGE training requirements."[176]

---

[172] Mulligan Tr., at 20-22.

[173] Doc. no. 68, at 19 (alteration supplied).

[174] Def.'s SoUF ¶ 15.

[175] Doc. no. 55-1, at 15-16 (citing Def.'s SoF, at 23-25) (alterations supplied).

[176] Doc. no. 68, at 21 (citing Pl. SoUF ¶ 19).

Additionally, plaintiff testified that, within the same week that he sent the e-mail stating that "I won't be able to attend the Memphis Edge classes due to the uncertainty of my medical condition at that time[,] and [of] which treatments I'll be going through then,"[177] he placed a call to defendant's EDGE trainers and received their approval to obtain the necessary training remotely, from his computer.[178] Although plaintiff did not inform David Mulligan of that fact, he essentially argued that he neglected to do so only because he was not told that his inability to attend the EDGE training sessions was a "problem."[179]

Finally, although plaintiff stated that defendant *could* have rescheduled the training at the June 18, 2009 meeting, defendant never *actually* rescheduled the training once he was reinstated.[180]  According to Mulligan, plaintiff has learned how to use the EDGE system from his coworkers, and has not experienced any difficulty using EDGE, or any limitation on his ability to perform computer-generated work, based upon the fact that the did not attend the training in Memphis.[181]  As a result, it appears that plaintiff's contention that he has satisfied the second element of a *prima facie* case is, at the very least, not wholly implausible.

---

[177] Pl. Ex. 23 (alterations supplied).

[178] Pl. Decl. ¶ 12.

[179] *See id.* ¶ 16.

[180] Mulligan Tr., at 128.

[181] *Id.* at 130.

In sum, because the requirement for plaintiff to travel to Memphis to receive EDGE training was not an "essential function" of plaintiff's position, and because there is no allegation of another "essential function" that plaintiff was unable to perform, with or without reasonable accommodation, this court holds that plaintiff meets the "qualified individual with a disability" element of the *prima facie* case.

### c.   Did plaintiff suffer an adverse employment action?

The concept of an "adverse employment action" is not limited to ultimate employment decisions, such as the decision to discharge an employee, but also may include employer conduct falling short of such employment decisions, *provided* the conduct complained of reaches some threshold level of substantiality.  *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998); *Gupta*, 212 F.3d at 587 ("Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause'" of Title VII.) (quoting *Wideman*, 141 F.3d at 1456).[182]

---

[182] *But see Gupta*, 212 F.3d at 587 (holding, in the context of a Title VII retaliation claim, that "[a]n adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'") (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

Here, plaintiff alleges three potential bases for finding an adverse employment action: the termination of his employment on March 17, 2009 (an event that defendant prefers to describe by the euphemistic term "layoff");[183] the lost overtime opportunities;[184] and the fact that, after plaintiff was reinstated, he was not returned to his old duties as PS&D Training Coordinator, but was instead assigned to managing inventory.[185] Normally, the March 17, 2009 termination of plaintiff's employment would, alone, satisfy the adversity standard. Here, however, defendant reversed that decision, and paid plaintiff the gross amount of $23,170.99 (the net amount of $9,901.97), which represented the entire amount of back pay for his time off work.[186] Defendant also made plaintiff whole for 401(k) and Retiree Medical Savings Plan contributions from March 17 through August 16, 2009,[187] and ensured that his seniority was not affected.[188]

Several courts from other circuits have held that termination decisions that are later reversed or rectified are not actionable as "adverse employment actions."[189] For

---

[183] Pl. Tr., at 268.

[184] Pl. Decl. ¶ 32.

[185] Pl. Tr., at 180, 184.

[186] *Id.* at 178-179; Pl. Tr. Ex. 11.

[187] *Id.* at 162.

[188] *Id.* at 161. Although plaintiff withdrew from the Union in February of 2010, his seniority remained intact. *Id.* at 242-245.

[189] *See, e.g., Jackson v. United Parcel Service, Inc.*, 548 F.3d 1137 (8th Cir. 2008) (no adverse employment action where the employer completed the grievance process and reinstated the

example, in *Sarko v. Henderson*, 03-03473, 2004 WL 2440202 (E.D. Pa. October 29, 2004), a United States Postal Service clerk was accused of sexually harassing a female postal carrier, placed on off-duty status without pay, and subsequently terminated. *Id.* at *1. More than a year later, after the arbitration of his union grievance, the clerk was returned to work and awarded back pay and benefits. *Id.* When the plaintiff sued the Postal Service, the court granted the defendant's motion for summary judgment on the following grounds:

> Subsequent to his reinstatement . . . Plaintiff can no longer lay claim to an adverse employment action. Notably, one of the ways Title VII and the ADEA compensate successful Plaintiffs is by awarding reinstatement with back pay. *See* 42 U.S.C. § 2000e-5(g); 29 U.S.C. § 626(b). Moreover, there is no evidence that the terms and conditions of Plaintiff's employment have been altered — Plaintiff did not lose salary, benefits, or seniority rights, nor was he reinstated to a different position, demoted in title, or scheduled to work a different shift or fewer hours.

---

plaintiff with full back pay and seniority); *Fair v. Norris*, 480 F.3d 865, 870 (8th Cir. 2007) (no adverse employment action where the employer corrected a demotion or denial of promotion, even one accompanied by a loss in pay, in a timely manner); *Tatum v. City of Berkeley*, 408 F.3d 543 (8th Cir. 2005) (no adverse action where the civil service board reversed the termination and reinstated the plaintiff without loss of pay or rank); *Estades-Negroni v. Associates Corp.*, 377 F.3d 58, 63 (1st Cir. 2004) (plaintiff "failed at the threshold" to show an adverse employment action where the employer initially denied her long-term disability benefits and terminated her employment, but later completed an appeal and reinstated her retroactively with benefits); *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (no adverse employment action where the employer initially delayed the plaintiff's promotion by two years, but later provided the promotion with retroactive pay and seniority); *Baxter v. Federal Express Corp.*, No. 04-941, 2006 WL 798935, at *8 (D. Conn. March 28, 2006) (no adverse employment action where the employer overturned the plaintiff's termination and reinstated her with back pay); *Lurie v. Meserve*, 214 F. Supp. 2d 546, 550 (D. Md. 2002) ("In order for a personnel action to be an adverse employment action, the action must be final and corrective action taken by defendant cannot be used as evidence that discrimination existed").

> Therefore, Plaintiff cannot establish a *prima facie* case of employment discrimination.

*Id.* at *3.

The Eleventh Circuit, however, has expressly declined to adopt the "no harm, no foul" rule, and held that "an employer cannot undo the harm its actions have caused, and thereby avoid liability, simply by attempting to make the employee whole retroactively." *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008). In that case, an African-American university employee accused the defendant of issuing a negative performance evaluation in retaliation for her action of challenging its policies as discriminatory. *Id.* at 964-66. It was undisputed that, as a result of the negative performance evaluation, the plaintiff did not receive a merit salary increase in 2002. *Id.* at 973. Even so, plaintiff did receive that merit salary increase retroactively, in 2003. *Id.* In reviewing the trial court's decision to grant the university's motion for summary judgment, the *Crawford* court held that the district court erred in assuming that the plaintiff's only injury was "having to await the results of her appeal before retroactively receiving her merit increase." *Id.* at 973 n. 11. The plaintiff "realized an actual loss [because she] . . . was deprived of the use or value of her merit pay from the time it otherwise would have been awarded in October 2002. In other words, [she] suffered an adverse employment action." *Id.* (alterations supplied). "*To conclude*

*otherwise would permit employers to escape Title VII liability by correcting their*

*discriminatory and retaliatory acts after the fact*." *Id.* at 972 (emphasis supplied).

Defendant "acknowledges the authority of *Crawford*," but attempts to
distinguish that case by arguing that plaintiff's

> return-to-work and make whole pay was specifically associated with the
> resolution of his grievance that he filed under the binding Collective
> Bargaining Agreement with the Union.  That specific distinguishing fact
> was not presented in or addressed by *Crawford*, and other courts have
> cited the policy of encouraging the resolution of such disputes by the
> parties through a formal grievance process in holding that there is no
> adverse employment action when the complaining party has been made
> whole.[190]

The attempt to distinguish *Crawford* is unpersuasive.

In *Jackson v. City of Centreville*, No. 09-02115, 2012 U.S. Dist. LEXIS 136066
(N.D. Ala. Aug. 16, 2012), a district court followed the holding in *Crawford* and found
an adverse employment action in spite of the fact that the plaintiff employees received
a formal grievance process, and in spite of the fact that they were subsequently
reinstated with back pay.  *Id.* at *28.  After the Mayor of Centreville fired an entire
crew for the stated reason of not watering the flowers, two African-American
employees filed a formal grievance accusing the City of engaging in discrimination.
*Id.* at *24.  As a result, the City Counsel held a special meeting to address their

---

[190] Doc. no. 74, at 6.

termination, and voted to appoint a three-person "Due Process Panel." *Id.*  In turn, the

panel held a personnel hearing and issued a recommendation to reinstate the

employees with back pay. *Id.* at *25.  Finally, the City Council held a second special

meeting and voted to adopt the panel's recommendation. *Id.* at *26.  Two weeks after

their termination, the plaintiffs were reinstated with back pay. *Id.*  Nevertheless, the

*Jackson* court found the existence of an adverse employment action on the grounds

that

> here, like in *Crawford*, Plaintiffs have introduced sufficient evidence to
> show they were injured by the termination.  Specifically, Plaintiffs have
> introduced evidence that they lost the vacation time they had
> accumulated prior to the termination[191] and that they were required to go
> through "considerable effort and concomitant emotional distress
> appealing their termination in such a public forum as the City Council,
> which subjected them to much humiliation, given the demeaning
> accusation of failing to water flowers that was the articulated basis for
> their termination." . . . There is sufficient evidence in the record such that
> a jury could find that Plaintiffs were harmed by the termination:
> Defendants cannot avoid liability for this simply because they later
> attempted to make Plaintiffs whole. *Crawford*, 529 F.3d at 972 (finding
> that to "conclude otherwise would permit employers to escape Title VII
> liability by correcting their discriminatory and retaliatory acts after the
> fact").  Accordingly, the undersigned finds that Plaintiffs have satisfied
> the adverse employment action prong of the analysis with respect to their
> termination.

*Id.* at 64-65 (footnotes omitted).

---

[191] In a footnote, the *Jackson* court noted that although the plaintiffs were compensated for
that time, "loss of use of the accumulated vacation time can be considered evidence of injury
associated with the termination." *Id.* at 65 n.41.

As in *Crawford* and *Jackson*, plaintiff suffered injuries from "loss of use" of his income and benefits.  While plaintiff was unemployed, he received $3,825 in unemployment compensation,[192] but otherwise had neither wages nor insurance coverage.[193]  As a result, plaintiff had to spend much of his family's savings and sell personal property, including an automobile, to make ends meet.[194]  He also began seeing a certified counselor and taking medication for depression and anxiety.[195]

In light of *Jackson*, there is no reason why the existence of a formal grievance process should constitute an exception to the rule that "an employer cannot undo the harm its actions have caused, and thereby avoid liability, simply by attempting to make the employee whole retroactively."  *Crawford*, 529 F.3d at 973.  As in *Jackson*, this court holds that plaintiff has satisfied the "adverse employment action" element of the *prima facie* case analysis with respect to his termination.

Additionally, plaintiff alleges that defendant did not compensate him for lost overtime opportunities, which plaintiff estimates at $12,000.[196]  Finally, it is undisputed that after plaintiff was reinstated, he was not returned to his old duties as

---

[192] *See* doc. 61-1.

[193] Pl. Decl. ¶ 31.

[194] *Id.*

[195] Pl. Tr., at 225-232; Pl. Decl. ¶ 30.

[196] Pl. Decl. ¶ 32.

PS&D Training Coordinator, but was instead given work managing inventory.[197]  As the concept of an "adverse employment action" can include sufficiently material employer conduct short of termination, *see Shannon*, 292 F.3d at 716, these claims may provide additional bases for holding the "adverse employment action" element met.

###     d.    Did defendant inflict an adverse employment action upon plaintiff "because of" his disability?

Finally, plaintiff must show that defendant inflicted the adverse employment action "because of" his disability.  *See McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073 (11th Cir. 1996).  The Eleventh Circuit has held that the "because of" language of the ADA only requires a showing that disability was a "motivating," or "determinative," factor in the contested employment decision, as opposed to the only factor.  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999).

According to defendant, the evidence shows that it made the March 17, 2009 decision to terminate plaintiff's employment "because of" his inability to attend the EDGE training sessions in Memphis due to a conflict with a doctor's appointment to treat his disability, not "because of" his disability.[198]  To support that allegation, defendant cites the following testimony by David Mulligan:

---

[197] Pl. Tr., at 80, 184.

[198] Doc. no. 55-1, at 17.

> Q:     Did you take from the e-mail that Mr. Brackin would not be able
> to attend EDGE training?
>
> A:     Yes.
>
> Q:     Okay.  And based on his inability to attend EDGE training, did
> you then determine that you could no longer accommodate his
> restrictions?
>
> A:     Yes.  That was part of it.[199]

Likewise, defendant cites the following testimony by plaintiff:

> A:     . . . The comp set up doctor's appointments that clashed with my
> scheduled attendance at the EDGE meetings.
>
> Q:     And so you did not go [to EDGE training] for that reason?
>
> A:     Right.
>
> Q:     Did you think that you could not go to Memphis for the EDGE
> training because of your work restrictions?
>
> A:     No, no.[200]

Finally, defendant argues that offering an accommodation to plaintiff for almost six

years before terminating his employment on March 17, 2009 "negates any inference

that [defendant] harbored any animus toward [him] about his alleged disability."[201]

In opposition to those arguments, plaintiff asserts that Mulligan admitted

making the March 17, 2009 decision to terminate his employment "because of" his

---

[199] Mulligan Tr., at 70-71.

[200] Pl. Tr., at 98 (alteration supplied).

[201] Doc. no. 55-1, at 18-19 (alterations supplied).

disability.[202]   Specifically, plaintiff alleges that Mulligan did not mention the conflict

between his doctor's appointment and the EDGE training at either the March 2, 2009

"restrictions review" meeting or the March 17, 2009 "termination" meeting.[203] Instead,

Mulligan told plaintiff on March 2, 2009 that he had issued a revised job description,

and that he believed that plaintiff could not perform his new duties.[204]   Likewise,

Mulligan stated on March 17, 2009 that plaintiff's "job description ha[d] changed,"

and that defendant "[could not] accommodate [his] restrictions."[205]

This court does not discern a meaningful difference between a decision to

terminate a plaintiff's employment "because of" a disability and a decision to do so

"because of" an appointment to treat that disability.  This court also refuses to hold

that defendant's act of providing six years of accommodation to plaintiff *before*

terminating his employment "negates any inference" of discriminatory animus,

because circumstances, *and supervisors*, can change.  *Indeed, there was a significant*

*change here*:  Mulligan only became the PS&D Manager in October of 2008,[206] less

than six months before making the decision to terminate plaintiff's employment on

---

[202] Doc. no. 68, at 20.

[203] Pl. SoDF ¶¶ 2-4.

[204] Pl. SoUF ¶ 9.

[205] Pl. Ex. 24 (alterations supplied).

[206] Mulligan Tr., at 8.

March 17, 2009.[207]  In any event, the parties' conflicting evidence raises questions of fact, and renders the "because of" causation issue unfit for resolution on a summary judgment motion.

### 2.    Pretext

Once a defendant has proffered a legitimate, nondiscriminatory reason for taking an adverse employment action, the plaintiff must "cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'"  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997) (citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  To do so, the plaintiff must "'demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly* by showing that the employer's proffered explanation is unworthy of credence.'"  *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (alteration in original, emphasis supplied).

---

[207] *Id.* at 268.

Here, defendant claims that it made the March 17, 2009 decision to terminate plaintiff's employment "because of" his inability to attend the EDGE training sessions in Memphis, not "because of" his disability.[208]   As stated above, this court sees no meaningful difference between a termination "because of" a disability and a termination "because of" an appointment to treat that disability. Nevertheless, out of an abundance of caution, it will examine whether plaintiff has succeeded in providing direct or circumstantial evidence of discrimination.

### a.   Direct evidence of pretext

In the context of employment discrimination cases, "direct evidence" means "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic."  *Wright v. Southland Corp.*, 187 F.3d 1287, 1298 (11th Cir. 1999). In other words, direct evidence of discrimination is "'evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' and 'that, if believed, proves the existence of a fact without inference or presumption.'" *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)).  "For statements of discriminatory intent to constitute

---

[208] Doc. no. 55-1, at 20.

direct evidence of discrimination, they must be made by a person involved in the challenged action." *Id.*

Plaintiff alleged that he overheard David Mulligan tell a coworker that he was there to clean up all the "low hanging fruit," and understood that statement as meaning that Mulligan "was going to try to find ways to eliminate employees with work restrictions."[209]  However, Mulligan testified that the comment was a reference to the fact that he had much work to do, and that the statement "[was not] about trying to find things to do, [but about having] to prioritize [his] time."[210]  Because Mulligan's statement is susceptible to any number of interpretations, at least one of which does not evince a discriminatory intent, this court holds that it is insufficient to constitute direct evidence.

Further, plaintiff alleged in his declaration filed in opposition to summary judgment that, during the March 17, 2009 meeting, defendant's Human Resource generalist, Samantha Gilland,

was very hostile toward me . . . [and] seemed glad when she told me:

a.   I would not receive any severance pay;

b.   The statute had run on my workers' compensation case[,] and it could not be reopened;

---

[209] Pl. Decl. ¶ 8.

[210] Mulligan Tr., at 99 (alterations supplied).

c.      I would not qualify for unemployment;

d.      I would have no insurance coverage;

e.      I would not qualify for disability retirement;

f.      I would not qualify for short- or long-term disability;

g.      That I could resign and get a job as a greeter at Wal-Mart if they
        would hire me for all they [defendant] cared;

h.      that 'the monkey is on your back now.'[211]

Although defendant denies that Gilland made or influenced Mulligan in making the decisions to stop accommodating plaintiff and, ultimately, to terminate his employment,[212] this court holds that plaintiff has created a genuine issue of material fact regarding her involvement.   If Gilland *was* involved, then her statements expressing hostility toward plaintiff could give rise to a strong inference of discrimination on the basis of plaintiff's disability.

Finally, plaintiff alleged that Mulligan stated that he was going to find an "able bodied man" to fill plaintiff's position;[213] and that Mulligan, in fact, used a non-disabled man named Timothy Prince to do so.[214]  According to plaintiff, in early 2009,

---

[211] Pl. Decl. ¶ 21 (alterations supplied).

[212] Doc. no. 74, at 10.

[213] Pl. Tr., at 266.

[214] Doc. no. 68, at 27.

defendant gave Prince the office next to plaintiff's, and increasingly assigned Prince tasks that plaintiff had previously performed as PS&D Training Coordinator.[215] Plaintiff believed that, after he was fired on March 17, 2009, Prince assumed many of his duties, and received most of his old work equipment, including his laptop computer and digital camera.[216]

Mulligan admitted that, after the decision terminating plaintiff's employment was reversed, plaintiff was not reassigned to his pre-termination position of PS&D Training Coordinator, and "was only assigned training in relation to the crew leaders and initial EDGE training."[217]  Even so, Mulligan alleged that neither Prince nor any other person was assigned to take plaintiff's place.[218]   Again, this court holds that plaintiff has created a genuine issue of material fact on the question of whether Prince was intended to become his replacement.  If that proves to be the case, it may also constitute direct evidence of discrimination.

### b.    Circumstantial evidence of pretext

Here, defendant claims that it made the March 17, 2009 decision to terminate plaintiff's employment "because of" his inability to attend the EDGE training sessions

---

[215] *Id.* at 189.

[216] *Id.* at 189, 192.

[217] Mulligan Tr., at 139.

[218] *Id.* at 88.

in Memphis due to a conflict with a doctor's appointment to treat his disability, not "because of" his disability.[219]   To show that defendant's proffered reason was pretextual, plaintiff makes the following four arguments:

First, plaintiff claims that going to Memphis was not an "essential function" of the position of PS&D Training Coordinator.[220]   In Part IV(B)(1)(a) of this opinion, addressing the question of whether plaintiff was a "qualified individual with a disability," this court held that providing EDGE training was an "essential function" of plaintiff's job, while going to Memphis to receive such training was not. Nevertheless, that is not the end of the analysis.

If a defendant has a legitimate, non-discriminatory reason for an adverse employment action, that reason is not pretextual, even if based on a belief that turns out to be mistaken.   *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex.");   *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."), *overruled on other grounds*, *Manders v. Lee*, 338 F.3d 1304

---

[219] Doc. no. 55-1, at 17.
[220] Doc. no. 68, at 22.

(11th Cir. 2003).  Thus, the issue is not whether the requirement for plaintiff to travel to Memphis for EDGE training was an essential function of his job, but whether the person or persons who made the March 17, 2009 decision to terminate plaintiff's employment knew that it was not.

Here, defendant argues that when David Mulligan made that decision, he did not know that going to Memphis was not essential because he did not know that EDGE training was available over a remote computer connection.[221]  However, at the time of the March 2, 2009 meeting, it appears that Mulligan knew that plaintiff could receive at least part of his EDGE training on some date other than the one that was then scheduled:

> A.    There's only a couple of times that you could do that training, that I was aware of.
>
> Q.    Have you since found out that there are multiple times that you could take that training?
>
> A.    The training itself could be done online.  The testing was — that was the only time you could do it.[222]

Further, in the section discussing the motion to strike the reference to Samantha Gilland's comments during the March 17, 2009 meeting, this court held that plaintiff has presented some evidence that is susceptible to the inference that Gilland

---

[221] Doc. no. 74, at 7-8.
[222] Mulligan Tr., at 47.

influenced the decision to terminate his employment.  Nevertheless, the record is devoid of evidence on whether Gilland knew that EDGE training was available remotely.  That creates sufficient uncertainty to withstand a summary judgment motion.  Second, plaintiff claims that he was never made aware of the fact that he was being terminated because he could not attend the EDGE training sessions in Memphis,[223] and never told what his revised job duties were, or why he could not perform them with his disability.[224]  According to plaintiff, it was only upon receiving defendant's reply to his grievance that he learned his inability to travel to Memphis had been a "problem."[225]

In response, defendant argues that "Mulligan testified that he told [plaintiff] during the meeting that one of the primary functions of the job was EDGE training.[226] Also, defendant argues that "Mulligan described the revised job description, including the required EDGE training, and presented a copy of it to Sutton, who was seated immediately beside [plaintiff]."[227]

---

[223] *See* Pl. Tr., at 261-262.

[224] *See id.* at 263; Pl. Ex. 28.

[225] Pl. Decl. ¶¶ 24-25.

[226] Doc. no. 74, at 8 (citing Mulligan Tr., at 44) (alteration supplied).

[227] *Id.* (citing Mulligan Tr., at 55) (alteration supplied).

However, the evidence on both these issues is ambiguous.   When asked whether he specifically stated that plaintiff's inability to attend the EDGE training sessions in Memphis was a "problem," Mulligan's answers were inconclusive:

> Q.    I mean, didn't you specifically tell him during the meeting, or did you, that the problem for him was his inability to attend EDGE training?  Or did you mention that at all?
>
> MR. TURNER:  Object to the form.  Go ahead.
>
> A.    No.[228]  There [were] two issues; there was the EDGE training[,] which[,] once again, came out of this[,] and then [there was] being able to do the PIT training, the fork truck training that was hands-on.  Once again, in dealing with the foreman, ideally the training coordinator would be the person who did that.[229]
>
> . . . .
>
> Q.    Did you tell [plaintiff], ["]Mr. Brackin, we desperately need you to go to the EDGE training?["]  Did you say those words?
>
> A.    Like I said, I don't remember the specific words that I said.[230]

At some point during the meeting, Mulligan handed Sutton the only copy of the revised job description for the position of PS&D Training Coordinator[231] when Sutton

---

[228] This court emphasizes that after receiving the objection to form, the attorney should clearly have rephrased the question.  As a result of the convoluted sentence structure, this court is unable to determine what Mulligan said "no" to.

[229] Mulligan Tr., at 39 (alterations supplied).

[230] *Id.* at 54-55 (alterations supplied).

[231] *See* Pl. Ex. 41.

and plaintiff "were sitting right next to each other."[232]   However, Mulligan could not confirm that plaintiff had a copy of that document.[233]   Again, that raises sufficient uncertainty to withstand a summary judgment motion.

Third, plaintiff claims that defendant "is clearly grasping at straws to present a legitimate excuse for its actions" by making two arguments in discovery that it did not rely on for summary judgment purposes: *i.e.*, the argument that plaintiff could not conduct hands-on training for clamp and fork truck operators, which defendant initially asserted in its answers to the interrogatories, and the argument that he did not get along with his coworkers, which defendant asserted in written discovery.[234] However, this court is unwilling to hold that there is evidence of pretext in defendant's mere act of raising certain arguments in discovery without using those argument at the summary judgment stage, even if it turns out that those arguments do not have merit.

Finally, plaintiff claims that the fact that the March 17, 2009 meeting to review plaintiff's restrictions was apparently unprecedented "casts serious doubt [on the fact] that the reason proffered by [defendant] in its brief was the actual reason" for its decision to terminate his employment.[235]   However, this court is also unwilling to hold

---

[232] Mulligan Tr., at 43.

[233] *Id.* at 55.

[234] Doc. no. 68, at 24.

[235] *Id.* at 25.

that there is evidence of pretext in the act of instituting a new practice, especially in the event that an employer hires a new supervisor or identifies a new need.  Even so, the evidence supporting the first two of plaintiff's four arguments is enough by itself to preclude summary judgment.

## C.    Harassment

"The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation." *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) (citing *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir.1985)).  Thus, a plaintiff cannot maintain an action for Title VII discrimination without timely filing an EEOC charge, *see generally* 42 U.S.C. § 2000e-5, and his complaint "is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge." *Id.* (citing *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir.1994); *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970)).

Here, plaintiff filed his initial EEOC charge against defendant on April 10, 2009,[236] and amended that charge on May 1, 2009.[237]  In doing so, he marked the boxes for "disability" and "retaliation," and wrote a detailed factual statement that did not

---

[236] Doc. 1; Pl.  Tr. Ex. 14.
[237] Pl. Tr. Ex. 15.

mention harassment.[238]  Additionally, plaintiff filed a complaint in the case before this court, which likewise did not mention harassment.[239]  Finally, plaintiff filed an amended response to defendant's motion for summary judgment, which did not address defendant's argument that any claim for harassment or hostile work environment was due to be dismissed.[240]  At this point, it is safe to assume that if any such claim ever existed, it has been abandoned.

### D.   Retaliation

When a plaintiff states a claim in his complaint, but does not defend that claim in his initial response to a motion for summary judgment, it is proper for the court to grant the motion. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (citing *McGinnis v. Ingram Equip. Co.*, 918 F.2d 1491, 1496 (11th Cir. 1990) (*en banc*)).

Although plaintiff stated a claim for retaliation in his complaint,[241] he did not address defendant's argument that that claim was due to be dismissed in his amended

---

[238] *Id.*

[239] Doc. no. 1.

[240] Doc. no. 68.

[241] Doc. no. 1 ¶ 20.

response in opposition to the summary judgment motion.[242]   As a result, this court

must conclude that any such claim has also been abandoned.

### E.    Failure to Accommodate

This Circuit recognizes the "settled rule that federal courts do not consider

arguments advanced for the first time in a reply brief or memorandum." *Platypus*

*Wear, Inc. v. Clarke Modet & Co., S.L.*, No. 06-20976, 2008 U.S. Dist. LEXIS

107078, *18-19 (S.D. Fla. June 23, 2008) (citing *United States v. Levy*, 379 F.3d 1241,

1244 (11th Cir. 2004)).

> "When a party moves for summary judgment on ground A, his
> opponent is not required to respond to ground B — a ground the movant
> might have presented but did not." *Malhotra v. Cotter & Co.*, 885 F.2d
> 1305, 1310 (7th Cir. 1989), *superseded by statute on other grounds as
> stated in Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir. 1992). . .
> . *see also Fisher v. Ciba Specialty Chemicals Corp.*, Civil Action No.
> 03-0566-WS-B, 2007 U.S. Dist. LEXIS 76174, 2007 WL 2995525, *9
> (S.D. Ala. Oct. 11, 2007) ("it is improper to raise new arguments in a
> reply brief or to recast a motion as something else in the movant's final
> briefing opportunity, after it is too late for the nonmovant to respond").

*Blackledge v. Ala. Dep't of Mental Health & Mental Retardation*, No. 06-321, 2007

U.S. Dist. LEXIS 79476, *30-31 (M.D. Ala. Oct. 25, 2007).

In *Platypus*, the court noted that defendant failed to move for summary

judgment on a certain issue and only raised that issue as a tangential argument in its

---

[242] Doc. no. 68.

reply. *Platypus*, 2008 U.S. Dist. LEXIS at *18.  Thus, it concluded that "on that procedural basis as well[,] there is ample ground to reject that argument," and denied the motion.  *Id.* (alteration supplied).

Likewise, the defendant in the present case did not raise the argument that plaintiff failed to request reasonable accommodation in its summary judgment motion.[243]  Instead, that argument initially appeared in plaintiff's response,[244] and later reappeared in defendant's reply.[245]  As a result, plaintiff was deprived of notice of defendant' *specific* arguments on that issue before responding to them.

In other words, what is sauce for the goose is sauce for the gander.  If plaintiff waives claims by failing to defend them in his response, then defendant waives arguments by failing to raise them in its motion.  In the future, defendant can avoid that result by timely seeking leave to amend the motion.

## V. CONCLUSION

This court will enter an appropriate order, consistent with this opinion, and granting: (1) the motion to strike the "rumor" reference from plaintiff's declaration;[246] (2) the motion for summary judgment on plaintiff's claim for harassment, and (3) the

---

[243] Doc. no. 55; doc. no 55-1.

[244] Doc. no. 68, at 30.

[245] Doc. no. 74, at 10.

[246] The offending reference states in full:  "At that time, there was a rumor in the department that Mulligan was sent there to get rid of employees with restrictions."  Pl. Decl. ¶ 8.

motion for summary judgment on plaintiff's claim for retaliation.  The remaining

portions of defendant's motions will be DENIED.

DONE this 9th day of October, 2012.

_____

United States District Judge